**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PROVE IDENTITY, INC.<br><br>Plaintiff,<br><br>v.<br><br>KYXSTART, INC.<br><br>Defendant. | C.A. No. ________________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Prove Identity, Inc. ("Plaintiff" or "Prove"), by and through its undersigned counsel, files this Complaint against Defendant KYXStart, Inc. ("Defendant" or "KYXStart"), and alleges as follows:

## NATURE OF THE ACTION

1. In this case, Prove seeks redress from the blatant and willful patent infringement committed by several of its former employees—employees who were in positions of leadership and trust at the company. Those employees worked for years at Prove, were privy to Prove's most proprietary technology, and surreptitiously made off with Prove's inventions to build a direct competitor—KYXStart—on a corrupt foundation of patent infringement. Now, having avoided much of the cost, risk, and considerable time and effort Prove endured to conceive, develop, and perfect its products, KYXStart competes directly with Prove, forcing Prove to battle with its own innovations in the marketplace. For these reasons, Prove brings this action for patent infringement under the Patent Laws of the United States, 35 U.S.C. §§ 100 et seq., including 35 U.S.C. § 271, and for tortious interference with contract under Delaware state law.

2. Prove, formerly known as Payfone, Inc., is a leader and innovator in the field of digital identity verification and authentication. Legacy authentication methods cannot keep up with modern identity needs. Modern threats exploit every gap between sessions, signals, and user behavior. Recognizing this need, Prove developed innovative new technologies and identity verification and authentication architectures that bridge these gaps, and leverage characteristics about the user and their devices in the real world to confirm their digital identity. These Prove-invented technologies enable businesses to verify the identity of individuals in a fast, secure, and frictionless manner, helping to mitigate fraud while improving the consumer experience.

3. In recognition of Prove's many innovations, the U.S. Patent and Trademark Office issued the following United States Patents, among others: U.S. Patent Nos. 12,058,528 ("'528 patent") and 12,200,816 ("'816 patent") (collectively the "Asserted Patents" or "Patents-in-Suit").

4. KYXStart is and has been infringing the Asserted Patents with its identity verification products and services, including without limitation Person Verification (KYC), Business Verification (KYB), Payments Verification (KYP), Telco Intelligence, Fraud Intelligence, Ongoing AML Monitoring, and the software and hardware implementing these products and services, such as verification-related software modules, computer-readable instructions, processors, and servers,[1] and any instrumentalities identified and referenced in the attached claim charts not listed here (collectively, the "Accused Products").

5. Among the employees who left Prove to found KYXStart is Ravindra Bijlani, who is the former Senior Vice President, International & Global Alliances at Prove. Renata Lowenbraun, Prove's former Vice President—Legal, Privacy & Product, is now the General Counsel

[1] *See, e.g.*, https://www.kyxstart.com/ (presenting, among other things, information about software, software modules, and service architectures relating to digital authentication and identity verification); *see also* Exhibits C-D (infringement claim charts).

at KYXStart. More recently, KYXStart induced Michael Stearne to become its Head of Product, knowing he had worked at Prove as its Director of Product Management, and knowing he was contractually bound by a non-compete agreement with Prove. These former Prove employees have first-hand knowledge of Prove's innovations, including those covered by the claims in the Asserted Patents. Indeed, Mr. Stearne is a *named inventor* on those Patents. Instead of competing fairly with its own home-grown technology, KYXStart, through Mr. Stearne and others, has developed products and services that willfully and flagrantly infringe on Prove's patented technology.

6. Prove seeks, among other relief, damages adequate to compensate for KYXStart's infringement of the Asserted Patents, enhanced damages for willful infringement, injunctive relief, damages for tortious interference with contract, and attorneys' fees and costs.

## **PARTIES**

7. Prove is a corporation organized under the laws of the State of Delaware, with a principal place of business at 245 Fifth Avenue, 20th Floor, New York, NY 10016.

8. On information and belief, KYXStart is a corporation organized under the laws of the State of Delaware, with a place of business located at 1055 Lillian Drive, Alpharetta, Georgia 30004. KYXStart has a registered agent to accept service of process within the State of Delaware located at United States Corporation Agents, Inc., 131 Continental Drive, Suite 305, Newark, Delaware 19713.

## **JURISDICTION AND VENUE**

9. The Court has subject matter jurisdiction over the patent infringement claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because they arise under the patent laws of the United States.

10. The Court has supplemental jurisdiction over the state law tortious interference with contract claim pursuant to 28 U.S.C. § 1367(a) because that claim is so related to the patent infringement claims within this Court's original jurisdiction that it forms part of the same case or controversy.

11. The Court has personal jurisdiction over KYXStart. KYXStart is subject to general personal jurisdiction because it is incorporated in the State of Delaware.

12. Venue is proper in this District under 28 U.S.C. § 1400(b). KYXStart resides in this District because it was and is incorporated under the laws of the State of Delaware.

## PATENTS-IN-SUIT

### A. The '528 Patent

13. The '528 patent, titled "Identity Network Representation of Communications Device Subscriber in a Digital Domain," was duly and legally issued on August 6, 2024, and names Prashant Janakrai Desai, David Louis Berra, Rodger R. Desai, Michael Bijelich, Jeffrey Robert Naujok, and Michael Stearne as the inventors. A true and correct copy of the '528 patent is attached as Exhibit A.

14. The '528 patent describes and claims, among other things, methods and apparatus comprising receiving, by an identity verifier computing device from a communications device, a signal to verify a subscriber is co-located with a communications device, wherein the subscriber has a real-world identity; establishing, by the identity verifier computing device, a plurality of nodes of an identity network, wherein: the identity network exists in an electronic or digital domain, the identity network is associated with the real-world identity via a persistent identifier, each node in the plurality of nodes is associated with the persistent identifier via a set of links, and each link in the set of links includes a trustworthiness parameter; responsive to a first set of interactions

by a first aspect of a set of aspects with at least a first node of the plurality of nodes, updating, by the identity verifier computing device, a first trustworthiness parameter of a first link between a second node of the plurality of nodes and a second aspect of the set of aspects; and transmitting, by the identity verifier computing device to the communications device, a verification that the subscriber is co-located with the communications device, wherein the verification is based, at least in part, on the first link.

15. The ’528 patent claims specific, unconventional technical solutions that were not well-understood, routine, or conventional in the art and that represent inventive concepts going well beyond any abstract idea. This includes, without limitation, the claimed identity-network architecture in which a plurality of nodes are associated with a persistent identifier via a set of links, each link carrying a trustworthiness parameter, and a cross-link trust-propagation mechanism that dynamically updates the trustworthiness parameter of one link in response to interactions occurring at a different node–aspect pair. The combined elements in the claims of the ’528 patent recite a defined, graph-based identity-verification architecture that goes well beyond any abstract concept. The claimed combination of features improves the technical capabilities of computer systems for digital identity management—enabling an identity verifier computing device to synthesize real-world identity signals and digital-domain interaction data through a coordinated trust-propagation framework, and to condition the ultimate subscriber co-location verification on the dynamically computed state of a specific link, in a manner no prior system could accomplish.

16. Prove is the assignee of the entire right, title, and interest in the ’528 patent.

**B. The ’816 Patent**

17. The ’816 patent, titled “Transmitting a Complement of User Parameters to a Communications Device,” was duly and legally issued on January 14, 2025, and names Jeffrey Robert

Naujok, Prashant Janakrai Desai, Michael Stearne, Rodger R. Desai, Ryan Alexander, and Kyle Price as the inventors. A true and correct copy of the ’816 patent is attached as Exhibit B.

18. The ’816 patent describes and claims, among other things, methods and apparatus comprising electronically verifying, via a particular authentication operation at a computing device, possession of a communications device by a subscriber of a communications network at least in part by: receiving, from the communications device, an authentication request that includes a time-limited-type identifier generated during the particular authentication operation, wherein the time-limited-type identifier is unique to the particular authentication operation and is passed between the computing device and the communications device so as to maintain a linkage through a plurality of steps of the particular authentication operation, and determining that the time-limited-type identifier is valid based on a number of times the time-limited-type identifier has been included in one or more authentication requests received within a recent time window; receiving, at the computing device via the communications network, at least a portion of personally identifiable information (PII) unique to the subscriber of the communications network; determining, at the computing device, an identity of the subscriber of the communications network based, at least in part, on the received at least the portion of the PII; and communicating, via the communications network, a complement set of PII to be pre-filled on a display of the communications device based, at least in part, on the determined identity of the subscriber of the communications network.

19. The ’816 patent claims specific, unconventional technical solutions that were not well-understood, routine, or conventional in the art and that represent inventive concepts going well beyond any abstract idea. This includes, without limitation, the claimed multi-step authentication architecture employing a time-limited-type identifier that is unique to a particular authentication operation, passed between a computing device and a communications device to maintain a

persistent linkage across a plurality of steps of the authentication operation, and validated based on the number of times it has been included in authentication requests received within a recent time window. The combined elements in the claims of the ’816 patent recite a defined, session-integrity protocol that goes well beyond any abstract concept. The claimed combination of features improves the technical capabilities of computer systems for secure, multi-step device authentication—enabling a computing device to detect and prevent third-party interception or replay attacks during an authentication session by binding the session to a unique, ephemeral identifier and monitoring its request frequency in a manner no prior system accomplished.

20. Prove is the assignee of the entire right, title, and interest in the ’816 patent.

## KNOWLEDGE AND WILLFULNESS

21. Ravindra Bijlani was a senior employee at Prove, having joined the company on or about October 30, 2017, as Vice President, Strategic Partnerships. He departed Prove in or about June 2022.

22. As a condition of his employment, Mr. Bijlani was required to execute, and did execute, a Proprietary Information and Inventions Agreement (the “PIIA”) on October 14, 2017, and had, during his tenure at Prove, access to Prove’s Proprietary Information, including information relating to the innovations that became the subject of the Asserted Patents.

23. Mr. Bijlani went on to co-found KYXStart and is its CEO. The association of Mr. Bijlani with KYXStart—who had, through his tenure, knowledge of the inventions that became the subject of the Asserted Patents—further demonstrates that KYXStart had actual knowledge of the Asserted Patents, the scope of the claimed inventions, and the infringing nature of the Accused Products.

24. Renata Lowenbraun was a senior employee at Prove, having joined the company on or about July 29, 2019, as Vice President—Legal, Privacy & Product. She departed Prove in or about March 2022.

25. During her tenure at Prove, Ms. Lowenbraun oversaw Prove's patent prosecutions as part of her duties and had access to Prove's Proprietary Information, including information relating to the innovations that became the subject of the Asserted Patents.

26. Ms. Lowenbraun joined KYXStart as a legal advisor in January 2025 and has since then been its General Counsel.[2] The association of Ms. Lowenbraun with KYXStart—who had, through her tenure, knowledge of the inventions that became the subject of the Asserted Patents—further demonstrates that KYXStart had actual knowledge of the Asserted Patents, the scope of the claimed inventions, and the infringing nature of the Accused Products.

27. Michael Stearne was a significant and senior employee at Prove during his tenure with the company. He joined the company as a Sales Engineer in May 2017 and was promoted to Global Product Manager in April 2019 and Director of Product Management in November 2022. Michael Stearne left Prove in October 2024 and joined KYXStart as a consultant, holding the role of KYXStart's Head of Product since January 2025.[3]

28. During his tenure at Prove, Mr. Stearne gained extensive knowledge of Prove's proprietary identity verification and digital authentication technology, including the technical and operational aspects of the products and systems Prove developed and provided.

---

[2] *See* Renata Lowenbraun (@renatalowenbraun), LINKEDIN, https://www.linkedin.com/in/renatalowenbraun [https://perma.cc/7CFD-JYSK] (last visited Sept. 28, 2026).
[3] *See* Michael Stearne (@mstearne), LINKEDIN, https://www.linkedin.com/in/mstearne/ [https://perma.cc/X7G6-6QHD] (last visited Sept. 28, 2026).

29. Mr. Stearne is a named inventor on both Asserted Patents and, accordingly, had direct, detailed, and first-hand knowledge of the patented inventions, the technology claimed in the Asserted Patents, and the Asserted Patents' prosecution history.

30. By virtue of his inventorship and his access to Prove's proprietary information, Mr. Stearne possessed particularized knowledge of the scope and substance of the Asserted Patents, including the technical innovations embodied therein.

31. On information and belief, KYXStart knowingly and intentionally recruited and engaged Mr. Stearne as a consultant by January 2025, with knowledge of his role at Prove developing the patented technology and his inventorship of both Asserted Patents.

32. KYXStart's specific and selective recruitment and engagement of Mr. Stearne was designed to obtain a competitive advantage by accessing his knowledge of Prove's innovations, including the inventions claimed in the Asserted Patents.

33. Through its recruitment and engagement of Mr. Stearne as a consultant, KYXStart obtained actual knowledge of the Asserted Patents and the scope of the claimed inventions.

34. On March 5, 2026, Prove sent KYXStart a letter providing notice of the Asserted Patents and informing KYXStart of its belief that KYXStart's products and services infringe the Asserted Patents.

35. On April 2, 2026, KYXStart, through its outside counsel, Blank Rome LLP, responded to Prove's notice letter. In its response, KYXStart expressly identified both U.S. Patent No. 12,058,528 and U.S. Patent No. 12,200,816 by number and purported to address the scope of each patent's claims, including with non-infringement arguments that were based on erroneous

constructions of the claims of the Asserted Patents and misstatements of facts concerning KYX-Start's infringing products. KYXStart had actual knowledge of the Asserted Patents and their claims, and KYXStart's infringement at least as of its receipt of Prove's notice letter.

36. Despite its knowledge of the Asserted Patents, their claims, and KYXStart's infringement of at least one of those claims since at least its hiring of former Prove employees and its receipt of Prove's notice letter, KYXStart has continued to make, use, sell, and offer to sell the Accused Products without authority or license from Prove. KYXStart's continued infringement following receipt of Prove's notice letter was and is willful, deliberate, and in conscious disregard of Prove's patent rights.

**<u>COUNT I</u>**

**(Infringement of the '528 Patent)**

37. Prove realleges and incorporates the allegations of the preceding paragraphs of this complaint as though fully stated herein.

38. KYXStart has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, the '528 patent by making, using, selling, and/or offering for sale in the United States the Accused Products, which in operation meet the limitations of the patented methods in the '528 patent, in violation of 35 U.S.C. § 271. Exemplary evidence and an exemplary chart mapping a claim of the '528 patent to the Accused Products and demonstrating KYXStart's infringement can be found in Exhibit C. Prove anticipates identifying additional asserted claims in accordance with the case schedule and its discovery obligations.

39. KYXStart also has been and is inducing infringement of the '528 patent by actively encouraging its customers and licensees to directly infringe the patented methods claimed therein. On information and belief, KYXStart's customers and licensees—including Tacilent.ai and Trident3—directly infringe the '528 patent by implementing and using the Accused Products in a

manner that practices the limitations of the patented methods.[4] As pleaded above, KYXStart was aware of the Asserted Patents, and knew or was willfully blind to the fact that its customers' and licensees' use of the Accused Products would constitute infringement. KYXStart has taken purposeful, culpable, and affirmative steps beyond ordinary acts incident to product distribution designed to bring about that infringement as its desired result. These purposeful, culpable, and affirmative steps include, but are not limited to, actively partnering with its customers to create and deploy specific infringing implementations of the Accused Products, providing technical support and consulting services to instruct customers to use the Accused Products in an infringing manner, and publicizing those infringing deployments through its own website and press releases in a manner designed to stimulate additional customers and licensees to adopt the same infringing use. These aforementioned acts have no obvious alternative explanation other than to bring about the use of the Accused Products in a manner that infringes the '528 patent. *See* footnote 6.

40. In the alternative and additionally, for at least the reasons pleaded above in Paragraphs 21–36, KYXStart subjectively believed there was a high probability that its customers directly infringed the '528 patent but nevertheless deliberately took steps to avoid learning that fact, in other words, willfully blinded itself to the infringing nature of the direct infringer's acts.

41. For at least these reasons, KYXStart's infringement has been, and continues to be, knowing, intentional, and willful.

---

[4] *See, e.g.*, Tacilent.ai Partners with KYXStart to Launch Real-Time "Know Your Entity" and "Know Your Vendor" Risk Intelligence, EZ NEWSWIRE, *available at* https://www.eznewswire.com/newsroom/tacilent-partners-with-kyxstart-to-launch-real-time-know-your-entity-and-know-your-vendor-risk-intelligence (last visited Sept. 18, 2026); KYXSTART and Trident3 Announce Strategic Partnership to Integrate Digital Identity at the Infrastructure Layer, Building Trust in DeFi to Drive Mass Adoption, MEDIUM, *available at* https://medium.com/@trident3/for-immediate-release-89acdc78924e (last visited Sept. 18, 2026); Trust at Every Trust Point, https://www.kyxstart.com/company (last visited Sept. 22, 2026) (listing companies that appears to be KYXStart's customers, including Instarails, Everyware, and N2N).

42. KYXStart's acts of infringement have caused and will continue to cause Prove damages for which Prove is entitled to compensation—which shall in no event be less than a reasonable royalty—and an increase in the damages award to Prove of up to three times that amount, pursuant to 35 U.S.C. § 284.

43. This case is exceptional and, therefore, Prove is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285.

**COUNT II**

**(Infringement of the '816 Patent)**

44. Prove realleges and incorporates the allegations of the preceding paragraphs of this complaint as though fully stated herein.

45. KYXStart has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, the '816 patent by making, using, selling, and/or offering for sale in the United States the Accused Products, which in operation meet the limitations of the patented methods in the '816 patent, in violation of 35 U.S.C. § 271. Exemplary evidence and an exemplary chart mapping a claim of the '816 patent to the Accused Products and demonstrating KYXStart's infringement can be found in Exhibit D. Prove anticipates identifying additional asserted claims in accordance with the case schedule and its discovery obligations.

46. KYXStart also has been and is inducing infringement of the '816 patent by actively encouraging its customers and licensees to directly infringe the patented methods claimed therein. On information and belief, KYXStart's customers and licensees—including Tacilent.ai and Trident3—directly infringe the '816 patent by implementing and using the Accused Products in a

manner that practices the limitations of the patented methods.[5] As pleaded above, KYXStart was aware of the Asserted Patents, and knew or was willfully blind to the fact that its customers' and licensees' use of the Accused Products would constitute infringement. KYXStart has taken purposeful, culpable, and affirmative steps beyond ordinary acts incident to product distribution designed to bring about that infringement as its desired result. These purposeful, culpable, and affirmative steps include, but are not limited to, actively partnering with its customers to create and deploy specific infringing implementations of the Accused Products, providing technical support and consulting services to instruct customers to use the Accused Products in an infringing manner, and publicizing those infringing deployments through its own website and press releases in a manner designed to stimulate additional customers and licensees to adopt the same infringing use. These aforementioned acts have no obvious alternative explanation other than to bring about the use of the Accused Products in a manner that infringes the '816 patent. *See* footnote 7.

47. In the alternative and additionally, for at least the reasons pleaded above in Paragraphs 21–36, KYXStart subjectively believed there was a high probability that its customers directly infringed the '816 patent but nevertheless deliberately took steps to avoid learning that fact, in other words, willfully blinded itself to the infringing nature of the direct infringer's acts.

48. For at least these reasons, KYXStart's infringement has been, and continues to be, knowing, intentional, and willful.

---

[5] *See, e.g.*, Tacilent.ai Partners with KYXStart to Launch Real-Time "Know Your Entity" and "Know Your Vendor" Risk Intelligence, EZ NEWSWIRE, *available at* https://www.eznewswire.com/newsroom/tacilent-partners-with-kyxstart-to-launch-real-time-know-your-entity-and-know-your-vendor-risk-intelligence (last visited Sept. 18, 2026); KYXSTART and Trident3 Announce Strategic Partnership to Integrate Digital Identity at the Infrastructure Layer, Building Trust in DeFi to Drive Mass Adoption, MEDIUM, *available at* https://medium.com/@trident3/for-immediate-release-89acdc78924e (last visited Sept. 18, 2026); Trust at Every Trust Point, https://www.kyxstart.com/company (last visited Sept. 22, 2026) (listing companies that appears to be KYXStart's customers, including Instarails, Everyware, and N2N).

49. KYXStart's acts of infringing the '816 patent have caused and will continue to cause Prove damages for which Prove is entitled to compensation—which shall in no event be less than a reasonable royalty—and an increase in the damages award to Prove of up to three times that amount, pursuant to 35 U.S.C. § 284.

50. This case is exceptional and, therefore, Prove is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT III

### (Tortious Interference with Contract)

51. Prove realleges and incorporates the allegations of the preceding paragraphs of this complaint as though fully stated herein.

52. On May 10, 2017, Prove extended an offer of employment to Michael Stearne. Mr. Stearne executed the offer letter on May 11, 2017.

53. As a condition of his employment, Mr. Stearne was required to execute, and did execute, a PIIA on May 11, 2017.

54. The PIIA contained post-employment restrictive covenants. Specifically, Section 4(d) of the PIIA provided that, for a period of one (1) year immediately following termination of Mr. Stearne's employment (for any or no reason, whether voluntary or involuntary), he would not directly or indirectly: (i) Cause any person to leave their employment with Prove; (ii) Solicit any Business Partner; or (iii) act in "Any Capacity" in or with respect to any "Competing Business" located within the State of New York, the rest of the United States, or anywhere else in the world.

55. The PIIA further required Mr. Stearne to hold in confidence and not disclose or use any Proprietary Information of Prove, including all business, technical, and financial information, and information relating to Prove's employees, Affiliates, and Business Partners.

56. Under Section 6 of the PIIA, Mr. Stearne's obligations under Sections 2, 3, and 4 of the PIIA expressly survived the termination of his employment, regardless of the reason for termination and whether voluntary or involuntary.

57. Prior to Mr. Stearne's departure from Prove in or about October 2024, Mr. Stearne executed a separation agreement (the "Separation Agreement") that expressly incorporated and required him to continue to comply with the obligations set forth in the PIIA, including, without limitation, the one-year post-employment restrictive covenant in Section 4(d) (the "Restrictive Covenant").

58. The offer letter, the PIIA, and the Separation Agreement (collectively, the "Stearne Agreements") constituted valid and enforceable contracts between Prove and Mr. Stearne that were supported by adequate consideration and were in full force and effect at all times relevant hereto.

59. On information and belief, KYXStart had knowledge of the existence of the Stearne Agreements, including the Restrictive Covenant, at the time it recruited and hired Mr. Stearne, or, at a minimum, knew facts from which the existence of such contractual obligations could reasonably be inferred.

60. On information and belief, KYXStart knew or should have known that Mr. Stearne was subject to post-employment restrictive covenants because: (a) it is standard practice in the identity verification and digital authentication industry for companies to require employees to execute proprietary information and non-compete agreements; (b) KYXStart itself requires its employees to execute similar agreements; (c) Mr. Stearne's senior position at Prove, a direct competitor of KYXStart in the identity verification space, made it readily foreseeable that Mr. Stearne was bound by such agreements; and (d) KYXStart's senior employees and executives, including Mr. Bijlani, were ex-Prove employees who also executed and had knowledge of the same PIIA,

and Ms. Lowenbraun as Prove's former Vice President, Legal, Privacy & Product should be aware of Prove's practice of signing a PIIA with employees containing post-employment restrictive covenants. Further, on information and belief, Mr. Stearne told KYXStart about his post-employment restrictive covenants.

61. On information and belief, KYXStart learned of the Restrictive Covenant, and proceeded to recruit and engage Mr. Stearne in deliberate disregard thereof, or alternatively, KYX-Start failed to make any reasonable inquiry into Mr. Stearne's contractual obligations to Prove before recruiting and engaging him.

62. Mr. Stearne departed Prove in October 2024. On information and belief, Mr. Stearne joined KYXStart in January 2025 as a consultant—within the one-year restricted period under the Restrictive Covenant—in breach of his obligations under the Stearne Agreements.

63. On information and belief, KYXStart specifically and selectively recruited Mr. Stearne, a key employee of Prove with extensive knowledge of Prove's proprietary identity verification technology and the Asserted Patents, for the purpose of obtaining a competitive advantage.

64. KYXStart's recruitment and engagement of Mr. Stearne was a significant factor in causing Mr. Stearne to breach the Restrictive Covenant and his confidentiality obligations under the PIIA and the Stearne Agreements.

65. On information and belief, KYXStart actively pursued Mr. Stearne, including offers of engagement or compensation, and sought to bring about Mr. Stearne to breach his contractual obligations to Prove under the Stearne Agreements, including but not limited to the obligations not to compete with Prove.

66. On information and belief, KYXStart's intentional recruitment and engagement of Mr. Stearne as a consultant was without justification or privilege. KYXStart had no legitimate

business reason to recruit an employee it knew or should have known was bound by enforceable restrictive covenants prohibiting him from working for a competitor of Prove during the agreed period.

67. As a direct and proximate result of KYXStart's knowing and intentional conduct of engaging Mr. Stearne, Prove has suffered and continues to suffer injury, including but not limited to: (a) loss of the benefit of the bargain for which Prove contracted under the Stearne Agreements; (b) competitive harm resulting from Mr. Stearne's engagement by a direct competitor before expiration of the restricted period; (c) the risk of disclosure and misappropriation of Prove's Proprietary Information, including trade secrets, business strategies, customer information, and technical know-how relating to Prove's identity verification technology; and (d) harm to Prove's goodwill, customer relationships, and competitive position in the market.

68. As a result of KYXStart's intentional and unjustified interference in Mr. Stearne's performance of his agreements, Prove has suffered damages, including but not limited to loss of the benefits for which it bargained in the Stearne Agreements, harm to its competitive position and goodwill, unjust enrichment of KYXStart, and economic loss, in an amount to be determined at trial.

69. KYXStart's conduct was intentional, willful, wanton, and in reckless disregard of Prove's rights, warranting an award of punitive damages in an amount to be determined at trial.

70. KYXStart's tortious interference with the Stearne Agreements was part of a unified scheme of unfair competition: KYXStart infringed the Asserted Patents with the Accused Products and poached Prove's key personnel—including a named inventor of those patents—to further facilitate that infringing activity. Because Prove's tortious interference claim arises from the same conduct, actors, and evidence as its willful patent infringement claims, the claims share a common

nucleus of operative facts and form part of the same case or controversy, warranting the exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a).

## JURY DEMAND

Prove demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Prove respectfully requests that the Court find in its favor and against KYXStart, and grant Prove the following relief:

a. A judgment that KYXStart has infringed and is infringing, directly and indirectly, the ’528 patent and ’816 patent;

b. A judgment that KYXStart must account for and pay damages adequate to compensate Prove for KYXStart’s infringement of one or more claims of the Asserted Patents, including for post-trial infringing acts, pursuant to 35 U.S.C. § 284, which shall in no event be less than a reasonable royalty;

c. A judgment that KYXStart has willfully infringed the ’528 patent and ’816 patent, and an increase in the damages award to Prove of up to three times the amount assessed, pursuant to 35 U.S.C. § 284;

d. A declaration that this case is exceptional and an award of reasonable attorneys’ fees in accordance with 35 U.S.C. § 285;

e. A judgment that KYXStart has tortiously interfered with the Stearne Agreements;

f. An award of compensatory damages for KYXStart’s tortious interference with the Stearne Agreements, including loss of the benefit of Prove’s bargain, competitive harm, and unjust enrichment;

g. An award of punitive damages for KYXStart's willful and bad-faith tortious interference with the Stearne Agreements;

h. Injunctive relief to prevent further misuse of Prove's Proprietary Information obtained through KYXStart's tortious interference;

i. Pre-judgment and post-judgment interest on damages;

j. Costs of this action; and

k. All other and further relief as this Court deems just and proper.

Dated: October 14, 2026

OF COUNSEL:

Douglas E. Lumish
(*pro hac vice* forthcoming)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3190
doug.lumish@weil.com

Joseph H. Lee
(*pro hac vice* forthcoming)
WEIL, GOTSHAL & MANGES LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (213) 667-5190
joseph.lee@weil.com

Bryce Bing Liu
*(pro hac vice* forthcoming)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
bryce.liu@weil.com

*/s/ Travis S. Hunter*
Travis S. Hunter (#5350)
Alexandra Ewing (#6407)
RICHARDS, LAYTON
& FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
hunter@rlf.com
ewing@rlf.com

*Attorneys for Plaintiff Prove Identity, Inc.*